The PEOPLE of the State of Colorado, Complainant,

v.

Burton C. UNDERHILL, Attorney-Respondent.

No. 84SA176.

Supreme Court of Colorado, En Banc.

June 11, 1984.

Linda Donnelly, Disciplinary Prosecutor, George S. Meyer, Deputy Disciplinary Prosecutor, Denver, for complainant.

Robert C. McCain, Denver, for attorney-respondent.

LOHR, Justice.

After a formal complaint was filed with the Grievance Committee charging the respondent, Burton C. Underhill, with three counts of professional misconduct, the disciplinary prosecutor and the respondent executed a Stipulation, Agreement, and Conditional Admission of Misconduct. The document, as later supplemented, contained a recommendation that the respondent be suspended from the practice of law for one year and one day, and be assessed costs. An inquiry panel of the Grievance Committee approved the stipulation and agreement and forwarded it to this court. We agree that the proposed discipline is appropriate for the violations of the Code of Professional Responsibility admitted in the stipulation. Therefore, we accept the Grievance Committee recommendation.

The respondent was admitted to the bar in 1966, is registered as an attorney, and accordingly is subject to the jurisdiction of this court and its Grievance Committee with respect to his conduct as an attorney. We summarize each of the three transactions involving the misconduct upon which the disciplinary proceeding is based, taking the facts from the stipulation of the parties.

I.

In the spring of 1981, Bertha L. Ostrom retained the respondent to represent her in a transaction in which she was returning a bar and restaurant to its former owner because of inability to make a large required payment. During the course of this representation, the respondent asked Ostrom and her husband, George, if they would like to reenter the bar business by purchasing Pier 11, an establishment owned by Leroy Jaramillo, who also was a client of respondent Underhill. Although the Ostroms lacked the funds for the $25,000 down payment on the $145,000 purchase price, the respondent assured them that he could obtain financing for the transaction notwithstanding the poor credit rating of the Ostroms. On June 9, 1981, Bertha Ostrom paid the respondent $1,000

as a retainer on his $3,500 fee for the transaction.

On August 24, 1981, George Ostrom signed a management contract with Jaramillo and began operating the Pier 11 business. He purchased the inventory for $6,500, using a $5,000 loan arranged by the respondent, to be repaid by coin machine returns, and paying the $1,500 balance from the bar receipts during the first two weeks of operation. When the management contract was signed, the respondent assured the parties that the closing of the Pier 11 purchase would occur in four to five weeks.

The closing did not occur as promised, and between August 24 and December 31, 1981, Jaramillo and George Ostrom attempted to get Underhill to set the closing. The liquor license for Pier 11 was to expire on December 31, and the parties were relying on Underhill to renew the license and to accomplish its transfer from Jaramillo to George Ostrom. Although the respondent eventually obtained a renewal, he never proceeded with the transfer of the license.

Despite numerous demands by the parties during January and February 1982 that the respondent arrange the closing, he did not do so. Jaramillo then learned that George Ostrom had failed to pay nearly $5,000 in Pier 11 bills and had defaulted on a loan to be assumed by the Ostroms as part of the purchase price. Jaramillo obtained other counsel, eventually recovered complete ownership and control of Pier 11, and sued and obtained judgment against George Ostrom for damages based on the unpaid bills.

The Ostroms paid Underhill $2,550 in attorney fees for this transaction, and Jaramillo paid him $4,950. In addition, Underhill obtained a $1,500 personal loan from Jaramillo, did not prepare a promissory note to protect his client, did not repay the loan within a few days as promised, but paid it about four months later and only after Jaramillo's new attorney imposed pressure for repayment.

Underhill did not adequately advise either the Ostroms or Jaramillo of the possible conflicts of interest that might develop in representing both parties in the Pier 11 transaction. Despite demands by the parties, Underhill failed and refused to return essential original documents relating to that matter until subsequent counsel intervened. His actions in presenting Jaramillo with unqualified buyers and inducing the Ostroms to enter into a business venture they could not afford, with assurances that he would find financing for them, prejudiced both clients. Jaramillo also kept the Ostroms' $2,500 earnest money payment.

The sale agreement was poorly drafted and its provisions were not followed by Underhill in structuring the prospective sale. Also, the management contract provided for the complete operation of the business by George Ostrom under Jaramillo's liquor license, a procedure violating relevant liquor code regulations.

We conclude that, as the parties agreed, respondent Underhill's conduct in the Pier 11 transaction violated C.R.C.P. 241.6 (misconduct by a lawyer); C.P.R. DR5–104(A) (entering into a business transaction with a client without full disclosure and consent); C.P.R. DR5–105(A), (B), and (C) (representing clients with differing interests without full disclosure and consent); C.P.R. DR6–101(A)(3) (neglecting a legal matter entrusted to the lawyer); and C.P.R. DR9–102(B)(4) (failure promptly to deliver properties in the possession of the lawyer and which the client is entitled to receive).

II.

After the respondent was first retained by the Ostroms in 1981, those clients expressed an interest in buying the Candelite Tavern, a bar that George Ostrom had managed for about four years and that was owned by the Kains, who also were clients of respondent Underhill. Underhill assured the Ostroms that he could arrange the necessary financing, and Bertha Ostrom then paid him $1,000 as a retainer on his $3,500 total fee for the transaction.

After a meeting between the Ostroms and the Kains, the parties agreed that Ber-

tha Ostrom would purchase the Candelite for $150,000, with $25,000 down payment, including $2,500 earnest money, and the balance to be carried for seven years by the Kains. The Kains wanted Bertha Ostrom to take over the business on July 1, 1981, before the sale could be completed, and the respondent advised that this could be accomplished by use of a management contract while all necessary licenses, loans, inspections, and other matters necessary to close the sale were being obtained and accomplished. The sale and management contracts were signed on June 28, 1981, and Bertha Ostrom began operating the business on July 1. She purchased the inventory for $8,600, including $5,600 cash, with the balance to be paid to the Kains over three months. Underhill was to obtain transfer of the liquor license.

Thereafter, at least once a week until December 31, 1981, the parties contacted Underhill to inquire about setting the closing, and about the status of the liquor license. Mrs. Kain advised Bertha Ostrom that she would retake possession of the bar on January 1, 1982, unless the transaction were closed earlier. On December 31, Underhill advised Bertha Ostrom that the financing was arranged and that he would deliver the $22,500 balance of the down payment that afternoon. He failed to do so until January 7, 1982, when he delivered a cashier's check obtained from his own bank.

Later, the respondent took Bertha Ostrom to his bank where she signed documents for a $30,600 loan. The proceeds were used in major part to pay the $22,500 down payment and to pay $7,000 to the respondent. The $7,000 represented $2,500 attorney fees for the Kains, $3,400 attorney fees for the Ostroms on the Candelite and Pier 11 transactions, and $1,100 to repay a loan from Underhill to Bertha Ostrom.

Although, in a meeting in June 1981 with an administrative officer, Underhill was given a checklist of documents necessary to obtain the transfer of the Candelite liquor license, he never accomplished the transfer. As a result, in December 1982 Mrs. Kain removed the license from the premises of the Candelite, forcing Bertha Ostrom to close the business pending transfer of the license.

In March 1982, Bertha Ostrom contacted Underhill and demanded return of her files for the Candelite and Pier 11 transactions. Underhill failed and refused to return them. Finally, in September 1982 Bertha Ostrom retained other counsel to obtain transfer of the liquor license. Although Underhill had numerous papers in his files necessary for the liquor license transfer, he did not return them despite several requests to do so. They were obtained eventually only after intervention by investigatory counsel for the Grievance Committee.

As with the Pier 11 transaction, the respondent did not adequately advise either of the sets of clients of the possible conflicts of interest that might develop in representing both the buyers and the sellers in the Candelite matter. The sale agreement prepared by Underhill was poorly drafted. Much of the contract is not applicable to the transaction, or was not followed by the respondent in structuring the transaction. Again, as in the Pier 11 sale, the management contract provision that Bertha Ostrom could operate the business with the Kains' liquor license was in violation of relevant liquor code regulations.

The respondent collected approximately $14,400 as attorney fees from all parties in the Candelite and Pier 11 transactions. It was agreed in the stipulation that any disputes with respect to the fees are best resolved through means other than the present disciplinary proceedings.

The parties have stipulated, and we agree, that Underhill's conduct in the Candelite matter violates C.R.C.P. 241.6 (misconduct by a lawyer); C.P.R. DR5–104(A) (entering into business transaction with client without full disclosure and consent); C.P.R. DR5–105(A), (B), and (C) (representing clients with differing interests without full disclosure and consent); C.P.R. DR6–101(A)(3) (neglecting a legal matter entrusted to the lawyer); and DR9–102(B)(4)

(failure promptly to deliver properties in the possession of the lawyer and which the client is entitled to receive).

## III.

On March 4, 1982, respondent Underhill borrowed $1,500 from his sister-in-law, Charlene A. Lewis, who was also his client, and signed an unsecured promissory note providing for payment in full with interest on March 12, 1982. On March 16, 1982, Underhill wrote a check for $1,500 to pay the loan, but the check was returned by the bank on or about March 25, 1982, because of insufficient funds. Thereafter, Lewis attempted on numerous occasions to contact the respondent, but he did not return her calls. On April 10, 1982, Lewis wrote the respondent and demanded payment but had not been paid by September 26, 1982, when she filed a request for investigation with the Grievance Committee.

We agree with the parties' stipulation that Underhill's conduct with respect to the Lewis loan violates C.R.C.P. 241.6 (misconduct by a lawyer); C.P.R. DR1–102(A)(4) and (6) (conduct involving dishonesty, fraud, deceit, or misrepresentation; conduct that adversely reflects on lawyer's fitness to practice law); and C.P.R. DR5–104(A) (entering into business transaction with client without full disclosure and consent).

## IV.

The parties have stipulated to certain mitigating facts, which we now summarize.

Underhill repaid the Lewis loan, and has returned all moneys paid to him by Jaramillo with respect to the Pier 11 matter, including the $4,950 attorney fee and the $1,500 personal loan. The respondent's time records reflect "the expenditure of at least $1,640.00 worth of time" on the Kains' behalf on the Candelite transaction, for which he received $2,500. The corresponding numbers for the Ostroms' attorney fee on the transaction are $2,771 and $3,500, respectively. In each instance the respondent claims he spent additional time that he did not document because he agreed to accept a flat fee. It was also agreed that the respondent did expend substantial time and energy on the Candelite matter and the Pier 11 transaction. With respect to the $2,550 received by Underhill from the Ostroms for the Pier 11 transaction, Underhill claims that at least $2,000 was received as a partial repayment of a $3,500 personal loan to George Ostrom. Ostrom admits that Underhill probably made this loan to him, although Ostrom cannot specifically recall. All the client files ultimately were returned to them. As to the potential conflicts, Underhill did advise the clients that if any conflicts arose between them during the purchases and sales, he would be unable to represent either side. However, he did not specifically advise them of the nature of the conflicts that could arise so as to enable them to comprehend the problem and to give informed consent to the multiple representation.

The respondent also was experiencing numerous severe personal problems during the times when the transactions involved in this grievance proceeding took place. His brother died unexpectedly, his marriage ended in divorce, and he was in financial difficulty. Underhill attempted to supplement his income by going into the bar business, but this venture proved unsuccessful and resulted in heavy loss and debt.

The parties also have agreed that Underhill experienced unanticipated problems in representing the Ostroms; however, it is not necessary to a resolution of this case to detail these difficulties.

The professional misconduct to which the respondent has stipulated is egregious and seriously prejudiced his clients in important financial transactions. It adversely reflects on the fitness of the respondent to practice law and tends to bring the legal profession into disrepute. In the past, Underhill has received two letters of admonition from the Grievance Committee. Notwithstanding the unfortunate personal circumstances that affected the respondent during the periods of his professional misconduct, a severe sanction is necessary and

appropriate as commensurate with the extent of Underhill's violations of his professional responsibilities. Accordingly, we order that Burton C. Underhill be suspended from the practice of law for one year and one day and that, as a condition of reinstatement, the respondent shall fully satisfy the terms and conditions of C.R.C.P. 241.22(b), (c) and (d). The respondent shall also pay the costs of this disciplinary proceeding in the amount of $1,448.30 to the Colorado Supreme Court Grievance Committee, 190 E. 9th Avenue, Suite 440, Denver, Colorado 80203, within six months of the date this opinion is issued.